**MARYLAND NATIONAL BANK, Plaintiff,**

v.

**RESOLUTION TRUST CORP., as receiver for Augusta Federal Savings Bank, Defendant.**

**Civ. No. L–92–1761.**

United States District Court, D. Maryland.

Aug. 3, 1995.

Mark C. Treanor and Stephen J. Hughes of Treanor, Pope & Hughes, Towson, MD, for plaintiff Maryland Nat. Bank.

Paul N. Sameth of Adelberg, Rudow, Dorf, Hendler & Sameth, Baltimore, MD, for defendant Resolution Trust Corporation as receiver for Augusta Federal Savings Bank.

*MEMORANDUM*

LEGG, District Judge.

The Court now decides the motion for summary judgment filed by the Resolution Trust Corporation ("RTC"). For the reasons given below, the Court shall DENY the motion.

## I. *FACTS*

The following facts are undisputed. On September 17, 1989, Augusta Federal Savings Bank ("Augusta"), through Senior Credit Officer Robert Schmuff, issued a check for $76,000, payable to Donald Cohen and Tyme–N–Tyde Marina, with which Cohen was to purchase a boat. The check bore a restrictive endorsement requiring the joint endorsement of both payees on the check. Cohen endorsed the check, forged the endorsement of Tyme–N–Tyde Marina, and deposited the money into his account at Maryland National Bank ("MNB"). As explained below, Cohen used the money for various activities, none of which involved buying a boat.

On November 4, 1989, Augusta, again acting through Schmuff, issued a check for $68,000, drawn payable to Walter Rupp and the Full Tilt Marine Company, as a loan for Rupp to buy a boat. Like the Cohen check, this check bore a restrictive endorsement requiring the joint endorsement of both payees. Like Cohen, Rupp endorsed the check, forged the endorsement of the Full Tilt Marine Company, and deposited the check into his own account at MNB. Like Cohen, Rupp used the money for purposes other than boat-buying.

Upon discovering the forgeries, Augusta instituted suit against MNB in the Circuit Court for Baltimore County to recover the amount of the checks. The Circuit Court granted summary judgment for Augusta and reserved judgment on the issue of damages.

Subsequently, the RTC assumed the role of conservator for Augusta, and the Circuit Court substituted RTC for Augusta as the proper party plaintiff in the case against MNB. The RTC's attorney, Robert Parsons, entered his appearance and conducted the case. For its part, MNB filed notices of deposition of several Augusta officers, including Robert Schmuff.

Before MNB took the depositions, however, the RTC accepted MNB's previously outstanding offer of $85,000 to settle the litigation. The parties entered into a release on November 19, 1991, by which the RTC discharged MNB from any and all liability resulting from the payment of the Cohen and Rupp checks.

About two days later, MNB officials discovered an article in the *Baltimore Sun*. The article reported that the United States Attorney's Office had indicted Schmuff for loan kiting in his capacity as Senior Credit Officer for Augusta. The kiting allegedly involved the creation of fictitious boat loans to business associates of Schmuff.

Eventually, Cohen and Schmuff pled guilty to the loan-kiting plan. According to their plea, Schmuff, in his capacity as Senior Credit Officer and Vice President for Consumer Loans at Augusta, engaged in a pattern of loan-kiting by approving fraudulent loans. He would cover losses from those loans with the proceeds of subsequent fraudulent loans for cars, boats and other collateral that either did not exist or had never been purchased. Schmuff invested the money from the loans in various car dealerships which he and Cohen owned and operated, and he spent the money on various personal expenses. Eventually, the scheme included other people, including Rupp, who received a kickback for applying for the fictitious loans.[1]

Upon learning of the scheme, MNB filed suit in this Court, alleging that, had it known the true nature of the Cohen and Rupp loans, it could have escaped liability under the "fic-

1. Amended Compl.Exh.L.

titious payee rule." [2] In its complaint, MNB claims that RTC and Augusta fraudulently concealed the true nature of the Cohen and Rupp loans until after the execution of the release. In the alternative, MNB asks the Court to set aside the agreement due to mutual mistake.

The RTC now moves for summary judgment, and MNB resists. The Court shall grant summary judgment when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). "The summary judgment inquiry thus scrutinizes the [non-moving party's] case to determine whether the [non-moving party] has proffered sufficient proof, in the form of admissible evidence, that could carry the burden of proof of his claim at trial." *Mitchell v. Data General Corp.*, 12 F.3d 1310, 1316 (4th Cir. 1993); *accord Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888–89, 110 S.Ct. 3177, 3188–89, 111 L.Ed.2d 695 (1990). In determining whether there exists a genuine issue of material fact, the Court views the facts, and all reasonable inferences to be drawn from them, in the light most favorable to the non-moving party. *Overstreet v. Kentucky Central Life Ins. Co.*, 950 F.2d 931, 937–38 (4th Cir.1991).

## II. *DISCUSSION*

### A. *The D'Oench, Duhme Doctrine*

1. *The Interaction between Common Law Doctrine and the Analogous Statute*

■ First, the RTC contends that the *D'Oench, Duhme* doctrine and its statutory codification, 12 U.S.C. § 1823(e), preclude MNB's claim.[3] As explicated below, both doctrines shield the RTC from unwritten agreements between a failed bank and a borrower. Generally, courts use the common law *D'Oench, Duhme* doctrine as a "safety net" for claims that elude the grasp of § 1823(e) but should not apprehend the banking authority. *In re NBW Commercial Paper Litigation*, 826 F.Supp. 1448, 1460–61 (D.D.C.1992); *see e.g., Brookside Assocs. v. Rifkin*, 49 F.3d 490 (9th Cir.1995).

Although courts often construe the § 1823 and the *D'Oench, Duhme* doctrine in tandem, *E.J. Sebastian Assocs. v. RTC*, 43 F.3d 106, 108 (4th Cir.1994), in fact they differ slightly. *E.I. du Pont de Nemours & Co. v. FDIC*, 32 F.3d 592, 597 (D.C.Cir.1994); *Vernon v. RTC*, 907 F.2d 1101, 1105–06 (11th Cir.1990). Because of these differences, the Court shall analyze the common law *D'Oench, Duhme* doctrine and its statutory counterpart separately.

### 2. *12 U.S.C. § 1823(e)*

■ Section 1823(e) of Title 12 of the United States Code provides:

No agreement which tends to diminish or defeat the interest of the [RTC] in any asset acquired by it under this section or section 1821 of this title, either as security for a loan or by purchase or as receiver of any insured depository institution, shall be valid against the [RTC] unless such agreement—

(1) is in writing,

(2) was executed by the depository institution and any person claiming an adverse interest thereunder, including the obligor, contemporaneously with the acquisition of the asset by the depository institution,

(3) was approved by the board of directors of the depository institution or its loan committee, which approval shall

---

2. In relevant part, Maryland's fictitious payee rule provides, "An endorsement by any person in the name of a named payee is effective if ... a person signing as or on behalf of a maker or drawer intends the payee to have no interest in the instrument." Md.Com.Law I Code Ann. § 3–405(1)(b) (1992).

3. The RTC does not cite the *D'Oench, Duhme* doctrine for the proposition that no oral agreement or understanding between Augusta and MNB can be invoked against the RTC. As detailed in the main text, the RTC argues instead that, even if it misrepresented to MNB the facts underlying the settlement agreement to MNB, the *D'Oench, Duhme* doctrine protects it from liability.

be reflected in the minutes of said board or committee, and

(4) has been, continuously, from the time of its execution, an official record of the depository institution.

The Court begins its analysis with the statute's language. *Reves v. Ernst & Young,* — U.S. —, —, 113 S.Ct. 1163, 1169, 122 L.Ed.2d 525 (1993); *Consumer Product Safety Comm'n v. GTE Sylvania, Inc.,* 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980). By its terms, § 1823(e) only protects those assets "acquired by [the RTC] under [section 1823] or section 1821...." Section 1823 concerns the management of RTC funds, and § 1821 pertains to the RTC's conservatorship and receivership powers.

The settlement agreement at issue in this case concerns none of these functions. The RTC did not acquire the settlement agreement through its conservatorship or receivership powers under § 1821 or § 1823, nor did the RTC acquire the agreement "as security for a loan or by purchase or as receiver...." Therefore, the settlement agreement is not an "asset acquired" under § 1823(e), and the statute does not protect the RTC's interest in the settlement agreement. *John v. RTC,* 39 F.3d 773, 776 (7th Cir.1994); *e.g., In re Century Centre Partners Ltd.,* 969 F.2d 835, 838 (9th Cir.1992) (assets acquired by Federal Deposit Insurance Corporation ("FDIC") as fund manager not covered by § 1823(e)), *cert. denied,* — U.S. —, 113 S.Ct. 2997, 125 L.Ed.2d 690 (1993); *Thigpen v. Sparks,* 983 F.2d 644, 645–46 (5th Cir.1993) (§ 1823(e) does not apply to bank's sale of assets).

■ Section 1823(e)'s focus on the records of the depository institution further suggests a regard only for the assets of the bank over which the RTC assumes control, rather than the assets of the RTC in general. Under § 1823(e), the agreement must have been "executed by *the depository institution....* contemporaneously with the acquisition of the asset by *the depository institution...."* 12 U.S.C. § 1823(e)(2) (emphases added). The agreement must also be "approved by the board of directors *of the depository institution,"* 12 U.S.C. § 1823(e)(3) (emphasis added), and continuously "an official record

of *the depository institution."* 12 U.S.C. § 1823(e)(4) (emphasis added). Thus, the terms of § 1823(e) "limit[ ] the statute's application to an agreement affecting the [RTC's] interest in an asset *of the bank,"* *Brookside Assocs.,* 49 F.3d at 495 (emphasis added), not of the RTC. *See E.I. du Pont,* 32 F.3d at 597 (§ 1823(e) only covers "conventional loan transactions.").

*Langley v. FDIC,* 484 U.S. 86, 108 S.Ct. 396, 98 L.Ed.2d 340 (1987) does not affect this reasoning. In *Langley,* the Supreme Court held that a mortgage note that a bank had fraudulently procured remained an "agreement" within the meaning of § 1823(e) and, therefore, any fraudulent statements by the bank must have been recorded according to § 1823(e) to be valid against the FDIC. MNB's attack on the RTC's § 1823(e) defense does not depend on the existence *vel non* of an "agreement," the issue *Langley* addressed. Rather, MNB's claim challenges the RTC's assumption that the settlement agreement constitutes an "asset acquired" by the RTC under the statute. Because the settlement agreement does not qualify as an "asset acquired" under the RTC's conservatorship or receivership powers, § 1823(e) does not preclude MNB's claim.

### 3. *The Common Law D'Oench, Duhme Doctrine*

■ In *D'Oench, Duhme & Co. v. FDIC,* 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942), the Supreme Court held that federal policy does not permit the assertion of an unwritten agreement between a bank and a borrower against the federal banking authorities. *D'Oench, Duhme,* 315 U.S. at 459–60, 62 S.Ct. at 680–81; *FDIC v. Hadid,* 947 F.2d 1153, 1157 (4th Cir.1991). The *D'Oench, Duhme* doctrine, as this holding is called, "enable[s] the FDIC or RTC to rely on official bank records to set forth the rights and obligations of the financial institution to the exclusion of extraneous matters." *RTC v. Allen,* 16 F.3d 568, 574 (4th Cir.1994); *see also Murphy v. FDIC,* 38 F.3d 1490, 1500 (9th Cir.1994) *(en banc )* ("*D'Oench, Duhme* prevents a debtor from using an oral agreement not to call his note against the FDIC.").

■ Typically, the *D'Oench, Duhme* doctrine "arises to bar a claimant from disputing the enforcement of a written loan agreement based upon an oral agreement that the claimant professes to have entered into with a bank official." *E.J. Sebastian,* 43 F.3d at 109. The doctrine thereby operates as a parol evidence rule, preventing the debtor from asserting an unwritten agreement against the RTC to vary the terms of a written agreement. *See FDIC v. State Bank of Virden,* 893 F.2d 139, 144 (7th Cir.1990).

■ In deciding whether the *D'Oench, Duhme* doctrine applies in a particular case, the Court primarily considers whether the alleged "scheme or arrangement" would tend to mislead the FDIC or the RTC. *D'Oench,* 315 U.S. at 460, 62 S.Ct. at 680–81; *E.J. Sebastian,* 43 F.3d at 108; *Timberland Design, Inc. v. First Service Bank for Sav.,* 932 F.2d 46, 50 (1st Cir.1991). The application of the doctrine necessarily requires a conflict between the alleged side agreement and the written document; if the side agreement comports with the written document, *D'Oench* does not present its assertion against the banking authority. *E.J. Sebastian.,* 43 F.3d at 109; *John,* 39 F.3d at 777.

■ The Court also considers whether the alleged agreement would necessarily appear in the bank's records. Generally, if the agreement would not ordinarily reside in the bank's records, the *D'Oench, Duhme* doctrine does not bar its assertion, *E.I. du Pont de Nemours and Co. v. FDIC,* 45 F.3d 458, 459 (D.C.Cir.1995); *Motorcity of Jacksonville, Ltd. v. Southeast Bank, N.A.,* 39 F.3d 292, 298–99 (11th Cir.1994), because *D'Oench* does not include in its ambit non-banking transactions. *E.J. Sebastian,* 43 F.3d at 109. For example, tort actions not based on secret agreements between a bank and a borrower overcome the *D'Oench, Duhme* barrier, *e.g., In re Geri Zahn, Inc.,* 25 F.3d 1539, 1543 (11th Cir.1994); *Hanson v. FDIC,* 13 F.3d 1247, 1252 (8th Cir.1994), and a bank's contract for services apparently clear the *D'Oench* hurdle as well. *E.J. Sebastian,* 43 F.3d at 109.

In this case, MNB does not dispute the validity of a written agreement between MNB and Augusta, the situation presented in most *D'Oench* cases. Rather, the RTC is using *D'Oench* to contest the enforceability of an agreement between MNB and the RTC.

This distinction subverts the RTC's argument. First, no possibility exists that the settlement agreement would deceive the RTC, because the RTC was a party to the agreement. As stated above, *D'Oench* applies only to agreements between "a bank and a borrower," *Hadid,* 947 F.2d at 1157, not the receiver and another party. Similarly, the alleged oral agreement does not contradict any written agreement with Augusta. Further, because the RTC itself allegedly committed the fraud, this transaction would not appear in the bank's records. Thus, this case resembles a freestanding claim, as in *E.J. Sebastian* or *Zahn, supra,* more than the typical *D'Oench* case.

In summary, the *D'Oench, Duhme* doctrine and § 1823(e) protect the RTC against certain unwritten agreements made by a bank over which the RTC assumes control, but they do not shield the RTC from the legal consequences of its own actions. Because *D'Oench* and § 1823(e) do not apply where the RTC is alleged to have defrauded a claimant, the Court shall reject the RTC's *D'Oench* defense.

### B. *The Applicability of Federal Law*

■ In reviewing the papers, the Court realized that the parties had assumed, without arguing, that Maryland law governed the instant claim. Nevertheless, the Financial Institutions Reform, Recovery and Enforcement Act of 1989 ("FIRREA") the jurisdictional grant in this case, provides that "any civil action, suit, or proceeding to which the [Resolution Trust] Corporation is a party *shall be deemed to arise under the laws of the United States....*" 12 U.S.C. § 1441a(*l*)(1) (emphasis added).

In light of this language, the Court asked the parties to file briefs discussing whether federal law or Maryland law applied to this case. *See D'Oench, Duhme,* 315 U.S. at 456, 62 S.Ct. at 678–79 (claim by FDIC involves question of federal law, not state law); *Id.* at 467–75, 62 S.Ct. at 678–79 (Jackson, J., concurring) (explaining majority's fashioning of

federal rule for banking claim); *Allen,* 16 F.3d at 574 (under § 1441a(*l*)(1), federal law applies where the RTC is a party). Instead of addressing the question, however, the briefs addressed the applicability of the *D'Oench, Duhme* doctrine. Rather than asking the parties again to file briefs, the Court shall decide the issue itself to expedite the proceedings.

The Court shall apply Maryland law to the instant claims. First and foremost, this case does not present a conflict between a state and a federal policy, a necessary precondition to the application of a federal common-law rule. *O'Melveny & Myers v. FDIC,* —— U.S. ——, ——, 114 S.Ct. 2048, 2055, 129 L.Ed.2d 67 (1994); *see, e.g., D'Oench, Duhme,* 315 U.S. at 455–59, 62 S.Ct. at 678–80 (conflict between Illinois's commercial paper policy and federal policy necessitated application of federal law); *see also RTC v. Maplewood Investments,* 31 F.3d 1276, 1290–94 (4th Cir. 1994) (interpreting *O'Melveny & Myers* to mandate application of state law in claim by RTC). Second, because the RTC comes into this case as Augusta's receiver, it assumes the rights and responsibilities of Augusta, *O'Melveny & Myers,* —— U.S. at ——, 114 S.Ct. at 2053, and any claims good against Augusta under state law apply with equal force against the RTC. *Id.* at ——, 114 S.Ct. at 2054. Third, because MNB brings its claims under Maryland law, Maryland law should govern the case. *FDIC v. Cocke,* 7 F.3d 396, 400 (4th Cir.1993), *cert. denied,* —— U.S. ——, 115 S.Ct. 53, 130 L.Ed.2d 12 (1994); *see RTC v. Everhart,* 37 F.3d 151 (4th Cir.1994) (Virginia statute of limitations governed RTC's commonlaw claims against failed bank's directors). Finally, the parties, by failing to address this issue, have waived any objections they may have had to the Court's ruling. Accordingly, the Court now examines the Maryland law on this issue.

### C. *MNB's Fraud Claim*
#### 1. *The Elements of Fraud Under Maryland Law*

■ To recover for fraud under Maryland law, a plaintiff must show:

(1) that the representation made is false;
(2) that its falsity was ... known to the speaker ... (3) that it was made for the purpose of defrauding the person claiming to be injured thereby; (4) that such person not only relied upon the misrepresentation, but had a right to rely upon it in the full belief of its truth, and that he would not have done the thing from which the injury resulted had not such misrepresentation been made; and (5) that he actually suffered damage resulting from such fraudulent misrepresentation.

*Martens Chevrolet, Inc. v. Seney,* 292 Md. 328, 439 A.2d 534, 537 (1982).

■ The RTC does not contest that it declined to reveal its knowledge of the Schmuff scheme to MNB. Instead, the RTC notes that MNB did not specifically ask about the availability of the "fictitious payee" defense during discovery, and neither Augusta nor the RTC supplied inaccurate, incomplete or misleading information. Because nondisclosure cannot support an action for fraud in Maryland, the RTC argues, MNB's fraud claim must fail.

■ To an extent, the RTC is correct. In Maryland, "nondisclosure does not constitute fraud unless there exists a duty of disclosure." *Impala Platinum Ltd. v. Impala Sales (U.S.A.), Inc.,* 283 Md. 296, 389 A.2d 887, 903 (1978). Consequently, to sustain its fraud claim, MNB must either point to an affirmative misrepresentation by the RTC or show that the RTC had a duty to disclose its knowledge of the Schmuff scheme. MNB attempts both.

First, MNB points to statements by Augusta officers and attorneys concerning the Cohen and Rupp loans. *Langley, supra,* however, prevents the MNB from holding the RTC legally accountable for the alleged misrepresentations of Augusta.

■ Next, plaintiff argues that the RTC's failure to supplement Augusta's pleadings to reflect its knowledge of the Schmuff scheme amounted to a violation of Maryland Rule of Civil Procedure 1–311, which states that the attorney's signature on a pleading certifies that the pleading is true to the best of the attorney's knowledge. This rule, MNB argues, imposed a duty on the RTC to disclose the Schmuff scheme in its court papers.

MNB's argument fails for two reasons. First, as stated above, *Langley* prevents MNB from using fraudulent representations by Augusta against the RTC. Also, MNB has not pointed to any false statements made during discovery; actually, it appears that Augusta and the RTC took great care in wording its discovery responses to avoid misstating the facts or disclosing the truth. Third, the record contains no indication that Augusta knew that any of its assertions in their pleadings were false when made. In fact, according to MNB, Augusta and the RTC learned about the Schmuff scheme in early 1991, months after the July 1990 filing of the complaint.[4] Therefore, MNB has shown no violation of Rule 1–311.

■ Third, MNB points to a colloquy between the Baltimore Circuit Court and Robert Parsons, counsel for the RTC during a hearing on the issue of damages:

THE COURT: What does history tell us about Mr. Cohen's intentions about going to sea?

MR. PARSONS: ... I think from the documents I have seen, which is all I can represent to Your Honor, he was interested in going to sea....

THE COURT: All right. So [Augusta's] point is that he came to them as far as they knew as a real live boat buyer, he said give me the money, they had negotiations and discussions and they gave him the money, and to protect themselves—was the boat to collateralize this loan?

MR. PARSONS: Yes, sir.[5]

MNB uses Parsons's statements for two purposes. First, it argues that Parsons, by making false statements to the Court, violated his duty as an attorney under Maryland Rule of Professional Conduct 3.3(a) (1995). That rule forbids a Maryland attorney from "mak[ing] a false statement of material fact or law to a tribunal" or failing to disclose a material fact "when disclosure is necessary to avoid assisting a criminal or fraudulent act

by the client." Thus, MNB argues that the RTC, through Parsons, had a duty to disclose the Schmuff scheme to the Baltimore Circuit Court, the breach of which may support an action for nondisclosure.

■ Even assuming for the moment that Parsons knowingly misrepresented material facts to the Circuit Court, that fact could not create a cause of action in favor of MNB. The Maryland Rules of Professional Conduct state explicitly, "Violation of a Rule should not give rise to a cause of action nor should it create any presumption that a legal duty has been breached." Maryland Rule of Professional Conduct (Scope). In light of this language, Maryland law refuses to impose liability for a breach of a rule of professional conduct. *Kersten v. Van Grack, Axelson & Williamowsky, P.C.,* 92 Md.App. 466, 608 A.2d 1270, 1275–76 (1992); *Schatz v. Rosenberg,* 943 F.2d 485, 492 (4th Cir.1991) (Maryland's ethical rules not intended "to create actionable duties in favor of third parties"), *cert. denied,* 503 U.S. 936, 112 S.Ct. 1475, 117 L.Ed.2d 619 (1992). Consequently, MNB may not use the Maryland Rules of Professional Conduct as the basis of a fraud action.

■ Alternatively, MNB uses Parson's statement as an affirmative misrepresentation. MNB alleges that Parsons had learned of the Schmuff scheme by the time he made his statement to the Circuit Court, and that therefore Parsons knowingly misrepresented the facts at the hearing. To support this allegation, MNB submits the affidavit of Martin Popp, a former Augusta Vice President, who alleges that the RTC knew of the Schmuff scheme in early 1991, well before the hearing.[6] The RTC denies this allegation.

In light of Popp's affidavit, Parson's statement is susceptible to several interpretations. Among these interpretations lies the possibility that Parson's misstated his knowledge of the true nature of the loans. Although the Court makes no findings about Parsons's

---

4. Affidavit of Martin Popp, ¶¶ 6–9, p. 1. Original Opp. to Def.Mot. For Summary Judgment Exh. O ("Popp Affidavit").

5. Transcript of April 3, 1991 Motions Hearing before the Circuit Court for Baltimore City at 13–15 (Amended Complaint Exh. F).

6. Popp affidavit ¶¶ 6–9.

state of mind, a jury could reasonably choose this interpretation. Therefore, the Court shall leave the resolution of this matter for trial.

■ The question remains whether a fraud plaintiff may hold a defendant liable for a misrepresentation made to a third party under Maryland law. The Court answers the question in the affirmative. Generally, "[o]ne who makes a fraudulent misrepresentation is subject to liability to the persons ... whom he intends or has reason to expect to act or refrain from action in reliance upon the misrepresentation...." Restatement (Second) of Torts § 531. Maryland law, referring to this rule, has long allowed plaintiffs to sue for injuries caused by fraudulent misrepresentations made to third parties. See, e.g., State v. Fox, 79 Md. 514, 29 A. 601 (1894); cf. Smith v. Rosenthal Toyota, Inc., 83 Md.App. 55, 573 A.2d 418, 421 (rejecting fraud claim based on misrepresentations to third-party because plaintiff could show no reasonable reliance on misrepresentations), cert. denied, 320 Md. 800, 580 A.2d 219 (1990). Additionally, Parson's speaking on the purpose of the loans negated the RTC's privilege to remain silent on the issue and imposed upon the RTC a duty to disclose its knowledge of the Schmuff scheme. E.g., Walsh v. Edwards, 233 Md. 552, 197 A.2d 424, 427 (1964); Fowler v. Benton, 229 Md. 571, 185 A.2d 344, 351 (1962).

In short, a reasonable jury could find that Parsons, in making his statement to the Circuit Court, had reason to expect that MNB would accept it as true and act accordingly. Also, given the posture of the litigation at that time, a reasonable jury could infer that MNB in fact reasonably relied on Parsons' statement, and that its reliance induced it to entering into the release. Thus, MNB has provided evidence sufficient to support its fraud claim at the summary judgment stage.

### 2. The RTC's Defenses

#### a. The Reasonableness of MNB's Reliance

■ As its first defense, the RTC argues that MNB knew or should have known of the Schmuff scheme prior to settlement. On this basis, the RTC disputes the reasonableness of MNB's reliance on any alleged misrepresentations.

■ The Court disagrees. Maryland law considers reliance unreasonable only where "the [true] facts should be apparent to one of [plaintiff's] knowledge and intelligence from a cursory glance or he has discovered something which should serve as a warning that he is being deceived...." Gross v. Sussex, 332 Md. 247, 630 A.2d 1156, 1167 (1993) (quoting W. Page Keeton, et al., Prosser and Keeton on the Law of Torts § 108 (5th ed. 1984)). Thus, even if MNB had an opportunity to learn the truth, it may still show reasonable reliance. Gross, 630 A.2d at 1165. As to the RTC's assertions regarding MNB'S actual knowledge of the scheme, the Court finds them arguable and shall accordingly allow the RTC to present its view of the facts before a jury.

#### b. The 1991 Release

■ The settlement agreement contains an integration clause and a waiver of further claims and defenses. The RTC argues that these provisions block MNB's claim. In Maryland, however, a party may always challenge a contract on grounds of fraud, even when the contract contains an integration clause. Rosenthal Toyota, 573 A.2d at 422. Accordingly, the Court repudiates this argument.

#### c. MNB's Failure to Offer Status Quo Restoration

■ Next, the RTC argues that MNB failed to offer to restore the parties to their status quo ante, which the RTC claims is a necessary prerequisite for equitable relief under Maryland law. This argument misstates Maryland equity jurisprudence; it also makes little sense. As consideration, MNB received only an ending to the litigation, and the Court fails to see how MNB could return that in light of the RTC's resistance. The return of consideration is unnecessary where restoration is impossible. Funger v. Mayor and Council of Somerset, 244 Md. 141, 223 A.2d 168, 174 (1966). Under these circumstances, Maryland equity rules did not require MNB to offer to restore the parties to

the status quo before instituting this litigation. Hence, the RTC's argument fails.

### D. *Exhaustion of Administrative Remedies*

 The RTC also argues that the Court lacks subject matter jurisdiction over this case because MNB failed to exhaust its administrative remedies pursuant to 12 U.S.C. § 1821(d). This is wrong for two reasons: first, the requirements of § 1821(d) apply only to claims against the failed depository institution and second, the RTC has already rejected MNB's claim.[7] The Court therefore declines this argument.

### E. *MNB's Mutual Mistake Claim*

The RTC contends that MNB cannot sustain a claim of mutual mistake in light of its purportedly inconsistent allegations of fraud. To the contrary, Federal Rule of Civil Procedure 8(e)(2) permits a party to "set forth two or more statements of a claim ... regardless of consistency." Thus, this argument fails as well.

The Court, however, does not believe that the facts of this case can be shoehorned into a "mutual mistake" theory. Accordingly, the release could not be overturned if both sides were truly ignorant of Schmuff's fraud when they executed it. The RTC has not made this argument in its summary judgment motion, however, and therefore the Court will take up this matter at trial.

### III. *CONCLUSION*

Whatever the rules are in a commercial context with respect to the duty owed to an adversary, that duty changes once the adversarial party makes a representation in open court. A party entering into a settlement agreement is entitled to rely upon the direct representations made by an adversary in a court of law to a judge. Once an attorney has made such a direct representation of fact, he is duty-bound to advise the court and opposing counsel if he subsequently learns that the representation was false.

7. Amended Compl. Exh. N.

In a court of law in response to a direct question from a judge, the RTC's attorney represented that, as far as the RTC knew, Augusta issued the checks in question pursuant to bona fide boat loans. This representation ultimately proved incorrect. If MNB proves at trial that the RTC or its attorneys knew the true facts before the release was executed, then the release and settlement agreement will be set aside.

In short, MNB may proceed with its case. Neither the *D'Oench, Duhme* doctrine nor 12 U.S.C. § 1823(e) stand in MNB's path and MNB has come forth with sufficient evidence to substantiate its fraud claim. Accordingly, the Court shall DENY the RTC's summary judgment motion.

The Court shall issue an appropriate Order.