In re **PRESTON TRUCKING COMPANY, INC.,**
Debtor.

**Preston Trucking Company, Inc., Plaintiff**

v.

**Liquidity Solutions, Inc., et al., Defendants**

**Teamsters National Freight Industry Negotiating Committee, et al., Appellants**

v.

**Liquidity Solutions, Inc., Appellee.**

**Bankruptcy No. 99–59994–JS.
Adversary No. 01–5293–JS.
Civ. No. L–05–1298.**

United States District Court,
D. Maryland.

Aug. 18, 2008.

Lawrence A. Katz, Venable, LLP, Vienna, VA, for Debtor.

Stephen E. Leach, Leach Travell Britt, PC, McLean, VA, for Debtor/Plaintiff.

C. Kevin Kobbe, DLA Piper US LLP, Maria Ellena Chavez-Ruark, Tydings & Rosenberg, LLP, Kimberly L. Bradley Abato, Rubenstein et al., Baltimore, MD, for Defendants.

## MEMORANDUM

BENSON EVERETT LEGG, Chief Judge.

This is an appeal from a final judgment entered by the United States Bankruptcy Court for the District of Maryland. During Preston Trucking Company Inc.'s ("Preston") Chapter 11 bankruptcy proceedings, Liquidity Solutions, Inc., ("Liquidity") purported to purchase from certain Preston employees (the "employees") their claims against Preston arising under an existing collective bargaining agreement and under the Worker Adjustment and Retraining Notification Act (the "WARN Act"). The bankruptcy judge, the Honorable James F. Schneider, ruled that the employees had legally transferred their claims to Liquidity.

The Teamsters National Freight Industry Negotiating Committee and a number of Teamster Local Unions affiliated with the International Brotherhood of Teamsters (collectively the "Teamsters") have appealed that ruling, contending that the Teamsters "own" the claims because they litigated them in Preston's bankruptcy proceeding and thus the employees had no right to assign the claims to Liquidity. The Teamsters also contend that, even if the employees could assign their claims, the specific assignments in this case were invalid.

On May 28, 2008, the Court held oral argument on the appeal. For the reasons that follow, the Court finds that the employees had the right to receive the pro-

ceeds of the litigation that the Teamsters pursued on their behalf. Furthermore, the Court finds that those rights are assignable, and the employees properly assigned them to Liquidity. Accordingly, the Court will, by separate order, AFFIRM, the bankruptcy court's decision.

## I. Background

On July 26, 1999, Preston, formerly one of the largest interstate motor freight carriers in the United States, ceased all operations and laid off all of its employees. On July 30, 1999, it filed a voluntary bankruptcy petition, under Chapter 11 of the United States Bankruptcy Code.

On various dates in October and November of 1999, approximately fifty individual Preston employees filed proofs of claim with the bankruptcy court. On November 19, 1999, the Teamsters filed a proof of claim for "grievances under the collective bargaining agreement." The proof of claim stated that the amount of the claim was "unknown and unliquidated." On November 22, 1999, the Teamsters filed a second proof of claim for $58.6 million under the WARN Act on behalf of union employees. Preston objected to the Teamsters' WARN Act claim. On March 6, 2000, Judge Schneider consolidated the Teamsters' WARN Act claim with an adversary proceeding that non-union employees, pursuing their own WARN Act claims, had previously filed.

In late 1999, and into 2000, Liquidity, which is in the business of buying and selling claims in bankruptcy cases, solicited Preston employees, seeking to purchase their claims against Preston. Liquidity sent a letter to each employee who held a claim against Preston for $1,000 or more.[1] Each letter offered to purchase the employee's claim for $.35 on the dollar and contained a boilerplate assignment contract by which the employee could transfer his or her claim against Preston to Liquidity.[2]

Liquidity vice president Robert Minkoff, who is also a licensed attorney in New York, testified that Liquidity fielded phone calls in response to the letters but never placed any calls to Preston employees. Approximately eighty-five Teamsters members returned completed assignment contracts to Liquidity. Once Liquidity received a signed assignment contract from an employee, it sent the contract along with a "transfer of claim" notice to the bankruptcy court for filing and docketing.

Word of the assignments soon reached the Teamsters. In January 2001, counsel for the Teamsters contacted Liquidity, purporting to represent the Preston employees who had assigned their claims. The Teamsters advised Liquidity that the employees would not perform their obligations under the assignments.

On March 12, 2001, Preston agreed to settle the Teamsters' two "master" claims on behalf of Preston's employees for a lump sum of $18,443,501.00. The settlement was incorporated into Preston's First Amended Plan of Liquidation ("the Plan"), which the Bankruptcy Court approved on April 13, 2001. The Plan assigned each union employee a portion of the settlement based on agreed upon estimates of the value of each employee's claim. The Plan

1. Liquidity learned the employees' names, addresses, and claim amounts by obtaining Preston's Schedule E from the bankruptcy court. Schedule E listed the employees, as opposed to the Teamsters, as the holders of the claims.

2. Each assignment contract included various representations and warranties, including the following: "Assignor owns and has title to the Claim free and clear of any and all liens, security interests, or encumbrances of any kind or nature whatsoever."

also provided that the Teamsters could adjust the amounts awarded to each union employee, provided that the aggregate total of all the claims remained the same. The Teamsters adjusted the awards on hundreds of occasions.

The plan was consummated in May or June 2001. Because the Teamsters and Liquidity asserted conflicting claims of ownership to the amounts Preston was to pay out to the employees, Preston filed an interpleader action.

Preston filed its interpleader complaint on June 11, 2001. At stake was approximately $220,083.11, which represented the amounts that were to be distributed from the bankruptcy estate to the employees who had assigned their claims against Preston to Liquidity.

The Teamsters and Liquidity promptly answered and filed cross-claims against each other. The Teamsters' cross-claim included three counts, all of which attacked the validity of the employees' assignments to Liquidity.[3] Liquidity brought a cross-claim against the employees for breach of contract and brought a cross-claim against the Teamsters for tortious interference with its contracts.

On September 28, 2001, Liquidity filed a motion for partial judgment on the pleadings. On October 4, 2001, the Teamsters filed a motion for summary judgment. The motions were denied by the Bankruptcy Court on February 21, 2002.

Judge Schneider held a bench trial on February 27, 2002 and on March 14, 2002. He issued a written opinion on April 8, 2005 denying the Teamsters' claims, granting Liquidity's breach of contract claim,

and denying Liquidity's tortious interference claim. The Teamsters then brought this appeal, challenging Judge Schneider's rulings.[4]

## II. STANDARD OF REVIEW

 The bankruptcy court's findings of fact are reviewed under a clearly erroneous standard, *See In re Club Assoc.*, 951 F.2d 1223, 1228 (11th Cir.1992), and are to be reversed only if an examination of the record yields the definite and firm conviction that a mistake has been made. *In re Morris Communications NC, Inc.*, 914 F.2d 458, 467 (4th Cir.1990); *see also* Bankr.Rule 8013; *Lowe's of Virginia, Inc. v. Thomas*, 60 B.R. 418, 419 (W.D.Va. 1986). The bankruptcy court's conclusions of law, however, are reviewed *de novo*. *In re Club Assoc.*, 951 F.2d at 1228–29; *In re Morris Communications NC, Inc.*, 914 F.2d at 467.

## III. ANALYSIS

The Teamsters make three arguments in their appeal of the bankruptcy court's ruling. The Teamsters argue that: (i) the employees did not own the claims they purported to assign; (ii) claims arising under a collective bargaining agreement and under the WARN Act are unassignable; and, (iii) the specific assignments in this case should be voided because they are unconscionable and Liquidity procured them through fraud and prohibited attorney-party contacts. The Court finds that each argument fails and will address each in turn.

### A. "Ownership" of the Claims

The first issue that the Court must address is the parties' dispute over who

---

**3.** Specifically, the Teamsters claimed that Liquidity had: (i) violated ethical and local rules, (ii) formed a contract of adhesion, misrepresentation, mistake, undue influence and fraud, and (iii) violated labor law.

**4.** Liquidity, however, does not appeal from Judge Schneider's decision to deny its tortious interference claim.

"owns" the employees' claims under the collective bargaining agreement and under the WARN Act. The claims that the employees purported to assign to Liquidity fell into two categories: (i) claims for wages under the collective bargaining agreement brought pursuant to § 301 of the Labor Management Relations Act (the "LMRA"), 29 U.S.C. § 185, and (ii) claims under the WARN Act.

The Court finds that while the Teamsters litigated the individual employees' claims, the employees retained the right to receive any recovery from that litigation. It is these rights that the employees transferred to Liquidity. Although the result is the same, the analysis with respect to each type of claim varies slightly.

### 1. Claims under the WARN Act

The WARN Act, 29 U.S.C. § 2101, *et. seq.*, requires that employers covered by the act provide 60–days notice of a plant closing or mass layoff to statutorily-defined employees. 29 U.S.C. §§ 2102(a)(1), (a)(5). An employer who fails to provide the required notice is liable to "each aggrieved employee who suffers an employment loss as a result of such plant closing or layoff." 29 U.S.C. § 2104(a)(1).

As the bankruptcy court noted, the structure of the statute demonstrates that while a union may bring a WARN Act claim, any recovery is ultimately owed to its individual members. The WARN Act states that the employer is liable to the individual "aggrieved employee." *See* 29 U.S.C. § 2104(a)(1). The statute goes on to state that either the aggrieved employee or its "representative" may sue to recover the amounts owed under the statute. 29

U.S.C. § 2104(a)(5). The WARN Act defines "representative" as the "exclusive representative" of the employees under 29 U.S.C. § 159, i.e. the employees' union. 29 U.S.C. § 2101(a)(4).[5] Taken together, these sections show that either a union or an individual union member may bring a WARN Act claim, but the individual member retains the right to receive any recovery.

### 2. Claims arising under the Collective Bargaining Agreement

The claims brought under Preston's collective bargaining agreement pose a closer question, because they implicate principles of federal labor law. Nevertheless, the Court finds that, like the employees' claims under the WARN Act, the employees retained the right to receive any recovery that the Teamsters garnered on their behalf and could assign that right to Liquidity.

The Teamsters argue that, under labor law, a union has the exclusive right to represent its member employees during labor negotiations and to litigate any claim for breach of a collective bargaining agreement. By extension, the union has exclusive control over who receives the funds it recovers through litigation against the employer, the Teamsters argue. The Court disagrees.

An action to collect damages under a collective bargaining agreement is governed by § 301 of the LMRA. A union, as a party to the collective bargaining agreement, may always bring suit against an employer for a violation of the agreement. *See UAW v. Hoosier Cardinal Corp.*, 383 U.S. 696, 699–700, 86 S.Ct. 1107, 16 L.Ed.2d 192 (1966). On the other hand,

**5.** A Union has "associational standing" to pursue its members' WARN Act claims. *United Food and Commercial Workers Union Local* *751 v. Brown Group, Inc.*, 517 U.S. 544, 558, 116 S.Ct. 1529, 134 L.Ed.2d 758 (1996).

an individual employee cannot bring a claim directly against his employer unless he also claims that the union has failed to adequately represent him. *See Chauffeurs, Teamsters, and Helpers, Local No. 391 v. Terry,* 494 U.S. 558, 568, 110 S.Ct. 1339, 108 L.Ed.2d 519 (1990).

██ The Teamsters correctly point out that this rule holds true in the bankruptcy context. *See In re Altair Airlines,* 727 F.2d 88, 89–90 (3rd Cir.1984); *In re Blue Diamond Coal,* 147 B.R. 720, 726 (Bankr. E.D.Tenn.1992); *U.S. Truck Co., Inc. v. Teamsters Nat'l Freight Industry Negotiating Committee (In re U.S. Truck Co., Inc.),* 89 B.R. 618, 621–622 (E.D.Mich. 1988). Accordingly, a union has the exclusive right to litigate a claim for breach of a collective bargaining agreement against an employer, whether or not the employer is in bankruptcy.

The above cited caselaw establishes that an employee cedes certain rights created by a collective bargaining agreement to his union, such as the right to enforce the agreement's terms. Nevertheless, these principles do not affect an employee's right to receive the proceeds of a lawsuit that the union brought on the employee's behalf. Accordingly, the Court finds that the individual employees retained the right to the proceeds of any litigation the Teamsters pursued against Preston.

██ At oral argument, counsel for the Teamsters warned that if employees were permitted to assign their claims under a collective bargaining agreement, employers could circumvent statutorily mandated collective bargaining. Under 29 U.S.C. § 158(a)(5), an employer has a duty to bargain with its employees' union, and an employer's refusal to do so constitutes an

"unfair labor practice." The Teamsters claim that an employer could engineer a scheme whereby a third party purchases employees' rights under a collective bargaining agreement, and then immediately assigns those rights back to the employer. In doing so, the employer could avoid its collective bargaining duties, the Teamsters argue.

The Court finds this argument unavailing for two reasons. First, there is simply no evidence that such a scheme existed in this case. Second, if such a situation arose in some future case, the employer's scheme itself would constitute an "unfair labor practice" under § 158(a)(5).

## B. Assignability of the Rights

Although the individual employees own the rights to receive anything that the Teamsters recover on their behalf, it does not automatically follow that those rights are assignable. The Court finds, however, that as a matter of federal law, the employees' claims are assignable.

██ The assignability of both types of claims in this case is governed by federal common law. First, because the WARN Act is a federal statute, the assignability of claims brought under it is governed by federal law.[6] Second, federal common law governs suits brought under § 301 of the LMRA. *See Textile Workers Union v. Lincoln Mills of Ala.,* 353 U.S. 448, 456, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957). It follows that federal law governs the assignability of such claims.

██ The Court finds that under federal common law, both WARN Act claims and claims arising under § 301 of the LMRA are assignable. No court has addressed the assignability of either claim.

---

**6.** *See APCC Services, Inc. v. AT&T Corp.,* 281 F.Supp.2d 41, 51 (D.D.C.2003) ("it is well settled that claim for relief is created by feder-

al statute, federal law governs the assignability of the claim.") (citation omitted) *rev'd on other grounds* 418 F.3d 1238 (D.C.Cir.2005).

Courts have, however, addressed the assignability of causes of action created by other federal statutes. Generally, Courts have held that such causes of action are assignable. *See, e.g., Lerman v. Joyce Int'l, Inc.*, 10 F.3d 106, 112 (3d Cir.1993) (acknowledging the assignability of civil RICO claims); *In re Fine Paper Litig.*, 632 F.2d 1081, 1090 (3rd Cir.1980) (holding that federal antitrust claims are assignable). As the Teamsters point out, however, the Eight Circuit has held that civil rights claims brought under 42 U.S.C. § 1983 are not assignable. *Carter v. Romines*, 560 F.2d 395, 396 n. 1 (8th Cir. 1977).

The Teamsters put forth a number of policy reasons why both WARN Act claims and claims under § 301 of the LMRA, like civil right claims, should not be assignable. The Court finds the Teamsters' arguments unavailing.

First, the Teamsters again argue that employees cede control over all aspects of claims arising under their collective bargaining agreement to their union. As stated above, however, even though a union has the exclusive right to litigate a claim under § 301 of the LMRA, the individual employee retains the right to receive the proceeds of the litigation. Allowing the employee to assign that right has no impact on the union's exclusive right to litigate the claim.

Second, the Teamsters argue that the WARN Act is more akin to the civil rights statutes than to other federal statutes. The Court disagrees. As stated above, the WARN Act gives the individual employee a right to recover under the statute. Nothing in the statute's structure or purpose evidences an intent by Congress to limit the ability of the individual employee to control that right as he sees fit.

## C. Unconscionability, Fraud, and Violation of the Rules of Ethics

Finally, the Teamsters argue that even if the employees owned the WARN Act claims and the claims arising under the collective bargaining agreement, and those claims could be assigned, the specific assignments in this case were void for three reasons: (i) the assignment contracts between Liquidity and the employees were, as a matter of law, unconscionable; (ii) representatives of Liquidity fraudulently induced the employees to enter into the assignment contracts; and (iii) by contacting the employees directly, Liquidity vice president Robert Minkoff, a licensed attorney, violated ethical rules that prohibit an attorney from contacting a party known to be represented by another attorney. The Court will address each argument in turn, applying New York state law, as dictated by the individual assignment agreements.[7]

### 1. *Unconscionability*

The Teamsters argue that the agreements between Liquidity and the employees were so one-sided that the Court should find them unconscionable. The Court disagrees.

A contract is unenforceable if it "is so grossly unreasonable or unconscionable in the light of the mores and

---

**7.** It is unclear whether federal law or state law governs the validity and interpretation of the employees' assignment agreements. The individual assignment contracts dictate that New York law governs any dispute arising out of those contracts. Other courts have held, however, that federal law governs the interpretation and validity of an assignment of a cause of action created by a federal statute. *Cf. Gulfstream III Associates, Inc. v. Gulfstream Aerospace, Corp.*, 995 F.2d 425, 437 (3d Cir.1993). The Court need not decide this issue, as the result is the same under either body of law. For simplicity, however, the Court will apply the law of New York.

business practices of the time and place as to be unenforceable according to its literal terms." *Gillman v. Chase Manhattan Bank, N.A.* 73 N.Y.2d 1, 10–11, 537 N.Y.S.2d 787, 534 N.E.2d 824 (1988) (citations omitted). To be unenforceable, a contract must be both "procedurally and substantively unconscionable." *Id.* In other words, there must be a showing of both "an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party." *Id.* The assignment agreements in this case are neither substantively nor procedurally unconscionable.

First, the contracts are not procedurally unconscionable. The contracts are simple, two page agreements in normal size font that clearly present the terms of the deal. Each employee had the ability to either accept or reject Liquidity's offer and was fully apprised of the meaning of the contract when he agreed to it.

Second, the contracts were not substantively unconscionable. As the bankruptcy court pointed out, claims against a bankrupt estate are inherently fraught with risk. *Cf. In re SPM Mfg. Corp.*, 984 F.2d 1305, 1314 (1st Cir.1993) ("Unsecured creditors often sell their claims to third parties, e.g., for 30 cents on the dollar in order to avoid the uncertainty and delay of bankruptcy proceedings.") Here, the employees received an immediate, guaranteed payment.

The Teamsters argue that Steven Leach, attorney for Preston, testified that throughout the bankruptcy proceeding, he believed that the employees' claims would be paid in full. The subjective belief of Mr. Leach, however, does not establish that there was no risk that the claims would not be paid in full.

2. *Fraudulent Inducement*

■ The Teamsters next argue that Robert Minkoff and Jack Singh, employees of Liquidity, induced the individual employees to enter into the assignment agreements through fraudulent misrepresentations of fact. To rescind a contract based on fraud in the inducement, the Teamsters must prove three elements (i) misrepresentation, concealment, or nondisclosure of a material fact; (ii) an intent to deceive; and (iii) an injury resulting from justifiable reliance by the aggrieved party. *Allen v. WestPoint–Pepperell, Inc.*, 945 F.2d 40, 44 (2d Cir.1991) (applying New York law).

■ At trial, the five Preston employees who testified alleged that Singh and Minkoff made various false statements. One employee, Webb Horton, is representative. Horton testified that Singh told him: (i) that Preston's creditors and vendors would be paid before its employees; (ii) that employees like Horton would probably receive nothing for their claims; and (iii) that if the employees did receive money, it would take eight to ten years. (Trial Tr. vol. 1, 65). The Teamsters argue that, in spite of their representations to employees such as Horton, Singh and Minkoff knew that the employees' claims were guaranteed to be paid in full and in any event would be paid before Preston's creditors and vendors.

Having heard testimony from both Minkoff and the individual employees, the bankruptcy court found that neither Minkoff nor Singh misrepresented, concealed, or failed to disclose a material fact. Upon review of the record, the Court holds that this finding was not clearly erroneous.

The employees were the only witnesses who testified that Singh and Minkoff made misrepresentations. The bankruptcy court did not find this testimony credible. Given that the employees' testimony was self-serving and confused on several points,

nothing in the record demonstrates that the bankruptcy court clearly erred.[8]

### 3. *Violation of Ethical Rules*

The Teamsters' final argument is that, Minkoff, a licensed attorney, violated Maryland Rule of Professional Conduct 4.2 because he directly contacted the individual employees and not their counsel in bankruptcy.[9] That rule states, "[i]n representing a client, a lawyer shall not communicate about the subject of the representation with a party the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized by law to do so." There are two fatal flaws in the Teamsters' argument.

First, a violation of an ethical rule cannot create independent civil liability nor does it create a presumption that a legal duty has been breached. *See Maryland Nat'l Bank v. Resolution Trust Corp.*, 895 F.Supp. 762, 771 (D.Md.1995) (citing *Schatz v. Rosenberg*, 943 F.2d 485, 492 (4th Cir.1991)). The Teamsters have identified no case in which the court held that such a violation warranted rescission of a contract. Accordingly, whether Minkoff violated a cannon of ethics is irrelevant to the enforceability of the assignment contracts.

Second, Minkoff, although a licensed attorney, was acting as an executive of Liquidity, not an attorney, when negotiating the assignment contracts. If a lawyer pursues his own business interests, he is not acting in a representative capacity, and the anti-contact rule, therefore, does not apply. *See Pinsky v. Statewide Grievance Comm.*, 216 Conn. 228, 235–236,

578 A.2d 1075, 1079 (1990) (holding that an attorney discussing his lease with his landlord was not representing a party, and therefore was not subject to the anti-contact rule).

The Court finds that Minkoff was pursuing his companies' business interests and not acting as an attorney in a representative capacity. Minkoff was a vice president at Liquidity but not its in-house counsel. Additionally, Minkoff was licensed only in New York, not in Maryland. He contacted the employees to initiate a business deal, the assignment of the employees' claims against Preston. Accordingly, Minkoff did not act as the attorney representative of Liquidity, and therefore, the attorney-contact rule did not apply to him.

### IV. Conclusion

---

8. For example, Horton testified that he discussed his claims against Preston with not only Singh, but also Preston management and his fellow Preston truck drivers. It is possible, therefore, that Horton confused his conversation with Singh with his other conversations concerning his claims.

9. The District of Maryland applies the Rules of Professional Conduct as adopted by the Maryland Court of Appeals. Local Rule 704.